# DAVIS v. MICHIGAN DEPARTMENT OF THE TREASURY

No. 87–1020.   Argued January 9, 1989—Decided March 28, 1989

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, O'CONNOR, and SCALIA, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 818.

*Paul S. Davis, pro se*, argued the cause and filed briefs for appellant.

*Michael K. Kellogg* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Rose, Deputy Solicitor General Merrill, David English Carmack*, and *Steven W. Parks*.

*Thomas L. Casey*, Assistant Solicitor General of Michigan, argued the cause for appellee. With him on the brief were *Frank J. Kelley*, Attorney General, *Louis J. Caruso*, Solicitor General, and *Richard R. Roesch* and *Ross H. Bishop*, Assistant Attorneys General.*

JUSTICE KENNEDY delivered the opinion of the Court.

The State of Michigan exempts from taxation all retirement benefits paid by the State or its political subdivisions, but levies an income tax on retirement benefits paid by all other employers, including the Federal Government. The question presented by this case is whether Michigan's tax scheme violates federal law.

I

Appellant Paul S. Davis, a Michigan resident, is a former employee of the United States Government. He receives re-

---

*\**Joseph B. Scott* and *Michael J. Kator* filed a brief for the National Association of Retired Federal Employees as *amicus curiae* urging reversal.

tirement benefits pursuant to the Civil Service Retirement Act, 5 U. S. C. § 8331 *et seq.* In each of the years 1979 through 1984, appellant paid Michigan state income tax on his federal retirement benefits in accordance with Mich. Comp. Laws Ann. § 206.30(1)(f) (Supp. 1988).[1] That statute defines taxable income in a manner that excludes all retirement benefits received from the State or its political subdivisions, but includes most other forms of retirement benefits.[2] The effect of this definition is that the retirement benefits of retired state employees are exempt from state taxation while the benefits received by retired federal employees are not.

In 1984, appellant petitioned for refunds of state taxes paid on his federal retirement benefits between 1979 and 1983. After his request was denied, appellant filed suit in the Michigan Court of Claims. Appellant's complaint, which was amended to include the 1984 tax year, averred that his federal retirement benefits were "not legally taxable under

---

[1] As a result of a series of amendments, this subsection has been variously designated as (1)(f), (1)(g), and (1)(h) at times relevant to this litigation. This opinion will refer only to the current statutory designation, § 206.30(1)(f).

[2] In pertinent part, the statute provides:

"(1) 'Taxable income' . . . means adjusted gross income as defined in the internal revenue code subject to the following adjustments:

.       .       .       .       .

"(f) Deduct to the extent included in adjusted gross income:

"(i) Retirement or pension benefits received from a public retirement system of or created by an act of this state or a political subdivision of this state.

.       .       .       .       .

"(iv) Retirement or pension benefits from any other retirement or pension system as follows:

"(A) For a single return, the sum of not more than $7,500.00.

"(B) For a joint return, the sum of not more than $10,000.00." Mich. Comp. Laws Ann. § 206.30(1)(f) (Supp. 1988).

Subsection (f)(iv) of this provision exempts a portion of otherwise taxable retirement benefits from taxable income, but appellant's retirement pay from all nonstate sources exceeded the applicable exemption amount in each of the tax years relevant to this case.

the Michigan Income Tax Law" and that the State's inconsistent treatment of state and federal retirement benefits discriminated against federal retirees in violation of 4 U. S. C. § 111, which preserves federal employees' immunity from discriminatory state taxation. See Public Salary Tax Act of 1939, ch. 59, § 4, 53 Stat. 575, codified, as amended, at 4 U. S. C. § 111. The Court of Claims, however, denied relief. No. 84–9451 (Oct. 30, 1985), App. to Juris. Statement A10.

The Michigan Court of Appeals affirmed. 160 Mich. App. 98, 408 N. W. 2d 433 (1987). The court first rejected appellant's claim that 4 U. S. C. § 111 invalidated the State's tax on appellant's federal benefits. Noting that § 111 applies only to federal "employees," the court determined that appellant's status under federal law was that of an "annuitant" rather than an employee. As a consequence, the court concluded that § 111 "has no application to [Davis], since [he] cannot be considered an employee within the meaning of that act." *Id.*, at 104, 408 N. W. 2d, at 435.

The Michigan Court of Appeals next rejected appellant's contention that the doctrine of intergovernmental tax immunity rendered the State's tax treatment of federal retirement benefits unconstitutional. Conceding that "a tax may be held invalid . . . if it operates to discriminate against the federal government and those with whom it deals," *id.*, at 104, 408 N. W. 2d, at 436, the court examined the State's justifications for the discrimination under a rational-basis test. *Ibid.* The court determined that the State's interest in "attracting and retaining . . . qualified employees" was a "legitimate state objective which is rationally achieved by a retirement plan offering economic inducements," and it upheld the statute. *Id.*, at 105, 408 N. W. 2d, at 436.

The Supreme Court of Michigan denied appellant's application for leave to appeal. 429 Mich. 854 (1987). We noted probable jurisdiction. 487 U. S. 1217 (1988).

## II

Appellant places principal reliance on 4 U. S. C. § 111. In relevant part, that section provides:

"The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States . . . by a duly constituted taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation."

As a threshold matter, the State argues that § 111 applies only to current employees of the Federal Government, not to retirees such as appellant. In our view, however, the plain language of the statute dictates the opposite conclusion. Section 111 by its terms applies to "the taxation of pay or *compensation for personal services as an officer or employee* of the United States." (Emphasis added). While retirement pay is not actually disbursed during the time an individual is working for the Government, the amount of benefits to be received in retirement is based and computed upon the individual's salary and years of service. 5 U. S. C. § 8339(a). We have no difficulty concluding that civil service retirement benefits are deferred compensation for past years of service rendered to the Government. See, *e. g., Zucker* v. *United States*, 758 F. 2d 637, 639 (CA Fed.), cert. denied, 474 U. S. 842 (1985); *Kizas* v. *Webster*, 227 U. S. App. D. C. 327, 339, 707 F. 2d 524, 536, (1983), cert. denied, 464 U. S. 1042 (1984); *Clark* v. *United States*, 691 F. 2d 837, 842 (CA7 1982). And because these benefits accrue to employees on account of their service to the Government, they fall squarely within the category of compensation for services rendered "as an officer or employee of the United States." Appellant's federal retirement benefits are deferred compensation earned "as" a federal employee, and so are subject to § 111.[3]

---

[3] The State suggests that the legislative history does not support this interpretation of § 111, pointing to statements in the Committee Reports

The State points out, however, that the reference to "compensation for personal services *as* an officer or employee" occurs in the first part of § 111, which defines the extent of Congress' consent to state taxation, and not in the latter part of the section, which provides that the consent does not extend to taxes that discriminate against federal employees. Instead, the nondiscrimination clause speaks only in terms of "discriminat[ion] against the officer or employee because of the source of the pay or compensation." From this the State concludes that, whatever the scope of Congress' consent to taxation in the first portion of § 111, the nondiscrimination clause applies only to current federal employees.

Although the State's hypertechnical reading of the nondiscrimination clause is not inconsistent with the language of that provision examined in isolation, statutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. See *United States* v. *Morton*, 467 U. S. 822, 828 (1984). When the first part of § 111 is read together with the nondiscrimination clause, the operative words of the statute are as follows: "The United States consents to the taxation of pay or compensation . . . if the taxation does not discriminate . . . because of the source of the pay or compensation." The reference to "*the* pay or compensation" in the last clause of § 111 must, in context, mean the same "pay or compensation" defined in the first part of the section. Since that "pay or compensation" includes retirement benefits, the nondiscrimination clause must include them as well.

---

that describe the scope of § 111 without using the phrase "service as an officer or employee." The language of the statute leaves no room for doubt on this point, however, so the State's attempt to establish a minor inconsistency with the legislative history need not detain us. Legislative history is irrelevant to the interpretation of an unambiguous statute. *United Air Lines, Inc.* v. *McMann*, 434 U. S. 192, 199 (1977).

Any other interpretation of the nondiscrimination clause would be implausible at best. It is difficult to imagine that Congress consented to discriminatory taxation of the pensions of retired federal civil servants while refusing to permit such taxation of current employees, and nothing in the statutory language or even in the legislative history suggests this result. While Congress could perhaps have used more precise language, the overall meaning of § 111 is unmistakable: it waives whatever immunity past and present federal employees would otherwise enjoy from state taxation of salaries, retirement benefits, and other forms of compensation paid on account of their employment with the Federal Government, except to the extent that such taxation discriminates on account of the source of the compensation.

## III

Section 111 was enacted as part of the Public Salary Tax Act of 1939, the primary purpose of which was to impose federal income tax on the salaries of all state and local government employees. Prior to adoption of the Act, salaries of most government employees, both state and federal, generally were thought to be exempt from taxation by another sovereign under the doctrine of intergovernmental tax immunity. This doctrine had its genesis in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), which held that the State of Maryland could not impose a discriminatory tax on the Bank of the United States. Chief Justice Marshall's opinion for the Court reasoned that the Bank was an instrumentality of the Federal Government used to carry into effect the Government's delegated powers, and taxation by the State would unconstitutionally interfere with the exercise of those powers. *Id.*, at 425–437.

For a time, *McCulloch* was read broadly to bar most taxation by one sovereign of the employees of another. See *Collector* v. *Day*, 11 Wall. 113, 124–128 (1871) (invalidating federal income tax on salary of state judge); *Dobbins* v. *Com-*

*missioners of Erie County*, 16 Pet. 435 (1842) (invalidating state tax on federal officer). This rule "was based on the rationale that any tax on income a party received under a contract with the government was a tax on the contract and thus a tax 'on' the government because it burdened the government's power to enter into the contract." *South Carolina* v. *Baker*, 485 U. S. 505, 518 (1988).

In subsequent cases, however, the Court began to turn away from its more expansive applications of the immunity doctrine. Thus, in *Helvering* v. *Gerhardt*, 304 U. S. 405 (1938), the Court held that the Federal Government could levy nondiscriminatory taxes on the incomes of most state employees. The following year, *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466, 486–487 (1939), overruled the *Day-Dobbins* line of cases that had exempted government employees from nondiscriminatory taxation. After *Graves*, therefore, intergovernmental tax immunity barred only those taxes that were imposed directly on one sovereign by the other or that discriminated against a sovereign or those with whom it dealt.

It was in the midst of this judicial revision of the immunity doctrine that Congress decided to extend the federal income tax to state and local government employees. The Public Salary Tax Act was enacted after *Helvering* v. *Gerhardt, supra*, had upheld the imposition of federal income taxes on state civil servants, and Congress relied on that decision as support for its broad assertion of federal taxing authority. S. Rep. No. 112, 76th Cong., 1st Sess., 5–9 (1939); H. R. Rep. No. 26, 76th Cong., 1st Sess., 2–3 (1939). However, the Act was drafted, considered in Committee, and passed by the House of Representatives before the announcement of the decision in *Graves* v. *New York ex rel. O'Keefe, supra*, which for the first time permitted state taxation of federal employees. As a result, during most of the legislative process leading to adoption of the Act it was unclear whether state taxation of federal employees was still barred by inter-

governmental tax immunity despite the abrogation of state employees' immunity from federal taxation. See H. R. Rep. No. 26, *supra*, at 2 ("There are certain indications in the case of *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), . . . that . . . Federal officers and employees may not, without the consent of the United States, be subjected to income taxation under the authority of the various States").

Dissatisfied with this uncertain state of affairs, and concerned that considerations of fairness demanded equal tax treatment for state and federal employees, Congress decided to ensure that federal employees would not remain immune from state taxation at the same time that state government employees were being required to pay federal income taxes. See S. Rep. No. 112, *supra*, at 4; H. R. Rep. No. 26, *supra*, at 2. Accordingly, § 4 of the proposed Act (now § 111) expressly waived whatever immunity would have otherwise shielded federal employees from nondiscriminatory state taxes.

By the time the statute was enacted, of course, the decision in *Graves* had been announced, so the constitutional immunity doctrine no longer proscribed nondiscriminatory state taxation of federal employees. In effect, § 111 simply codified the result in *Graves* and foreclosed the possibility that subsequent judicial reconsideration of that case might reestablish the broader interpretation of the immunity doctrine.

Section 111 did not waive all aspects of intergovernmental tax immunity, however. The final clause of the section contains an exception for state taxes that discriminate against federal employees on the basis of the source of their compensation. This nondiscrimination clause closely parallels the nondiscrimination component of the constitutional immunity doctrine which has, from the time of *McCulloch* v. *Maryland*, barred taxes that "operat[e] so as to discriminate against the Government or those with whom it deals." *United States* v. *City of Detroit*, 355 U. S. 466, 473 (1958). See also *McCulloch* v. *Maryland*, *supra*, at 436–437; *Miller*

v. *Milwaukee*, 272 U. S. 713, 714–715 (1927); *Helvering* v. *Gerhardt*, *supra*, at 413; *Phillips Chemical Co.* v. *Dumas Independent School Dist.*, 361 U. S. 376, 385 (1960); *Memphis Bank & Trust Co.* v. *Garner*, 459 U. S. 392, 397, and n. 7 (1983).

In view of the similarity of language and purpose between the constitutional principle of nondiscrimination and the statutory nondiscrimination clause, and given that § 111 was consciously drafted against the background of the Court's tax immunity cases, it is reasonable to conclude that Congress drew upon the constitutional doctrine in defining the scope of the immunity retained in § 111. When Congress codifies a judicially defined concept, it is presumed, absent an express statement to the contrary, that Congress intended to adopt the interpretation placed on that concept by the courts. See *Midlantic National Bank* v. *New Jersey Dept. of Environmental Protection*, 474 U. S. 494, 501 (1986); *Morissette* v. *United States*, 342 U. S. 246, 263 (1952). Hence, we conclude that the retention of immunity in § 111 is coextensive with the prohibition against discriminatory taxes embodied in the modern constitutional doctrine of intergovernmental tax immunity. Cf. *Memphis Bank & Trust*, *supra*, at 396–397 (construing 31 U. S. C. § 742, which permits only "'nondiscriminatory'" state taxation of interest on federal obligations, as "principally a restatement of the constitutional rule").

On its face, § 111 purports to be nothing more than a partial congressional consent to nondiscriminatory state taxation of federal employees. It can be argued, however, that by negative implication § 111 also constitutes an affirmative statutory grant of immunity from discriminatory state taxation in addition to, and coextensive with, the pre-existing protection afforded by the constitutional doctrine. Regardless of whether § 111 provides an independent basis for finding immunity or merely preserves the traditional constitutional prohibition against discriminatory taxes, however, the in-

quiry is the same. In either case, the scope of the immunity granted or retained by the nondiscrimination clause is to be determined by reference to the constitutional doctrine. Thus, the dispositive question in this case is whether the tax imposed on appellant is barred by the doctrine of intergovernmental tax immunity.

## IV

It is undisputed that Michigan's tax system discriminates in favor of retired state employees and against retired federal employees. The State argues, however, that appellant is not entitled to claim the protection of the immunity doctrine, and that in any event the State's inconsistent treatment of Federal and State Government retirees is justified by meaningful differences between the two classes.

## A

In support of its first contention, the State points out that the purpose of the immunity doctrine is to protect governments and not private entities or individuals. As a result, so long as the challenged tax does not interfere with the Federal Government's ability to perform its governmental functions, the constitutional doctrine has not been violated.

It is true that intergovernmental tax immunity is based on the need to protect each sovereign's governmental operations from undue interference by the other. *Graves*, 306 U. S., at 481; *McCulloch* v. *Maryland*, 4 Wheat., at 435–436. But it does not follow that private entities or individuals who are subjected to discriminatory taxation on account of their dealings with a sovereign cannot themselves receive the protection of the constitutional doctrine. Indeed, all precedent is to the contrary. In *Phillips Chemical Co., supra*, for example, we considered a private corporation's claim that a state tax discriminated against private lessees of federal land. We concluded that the tax "discriminate[d] unconstitutionally against the United States *and its lessee*," and accordingly held that the tax could not be exacted. *Id.*, at 387

(emphasis added). See also *Memphis Bank & Trust, supra; Moses Lake Homes, Inc.* v. *Grant County,* 365 U. S. 744 (1961); *Collector* v. *Day,* 11 Wall. 113 (1871); *Dobbins* v. *Commissioners of Erie County,* 16 Pet. 435 (1842). The State offers no reasons for departing from this settled rule, and we decline to do so.[4]

## B

Under our precedents, "[t]he imposition of a heavier tax burden on [those who deal with one sovereign] than is im-

---

[4] The dissent argues that this tax is nondiscriminatory, and thus constitutional, because it "draws no distinction between the federal employees or retirees and the vast majority of voters in the State." *Post,* at 823. In *Phillips Chemical Co.,* however, we faced that precise situation: an equal tax burden was imposed on lessees of private, tax-exempt property and lessees of federal property, while lessees of state property paid a lesser tax, or in some circumstances none at all. Although we concluded that "[u]nder these circumstances, there appears to be no discrimination between the Government's lessees and lessees of private property," 361 U. S., at 381, we nonetheless invalidated the State's tax. This result is consistent with the underlying rationale for the doctrine of intergovernmental tax immunity. The danger that a State is engaging in impermissible discrimination against the Federal Government is greatest when the State acts to benefit itself and those in privity with it. As we observed in *Phillips Chemical Co.,* "it does not seem too much to require that the State treat those who deal with the Government as well as it treats those with whom it deals itself." *Id.,* at 385.

We also take issue with the dissent's assertion that "it is peculiarly inappropriate to focus solely on the treatment of state governmental employees" because "[t]he State may always compensate in pay or salary for what it assesses in taxes." *Post,* at 824. In order to provide the same after-tax benefits to all retired state employees by means of increased salaries or benefit payments instead of a tax exemption, the State would have to increase its outlays by more than the cost of the current tax exemption, since the increased payments to retirees would result in higher federal income tax payments in some circumstances. This fact serves to illustrate the impact on the Federal Government of the State's discriminatory tax exemption for state retirees. Taxes enacted to reduce the State's employment costs at the expense of the federal treasury are the type of discriminatory legislation that the doctrine of intergovernmental tax immunity is intended to bar.

posed on [those who deal with the other] must be justified by significant differences between the two classes." *Phillips Chemical Co. v. Dumas Independent School Dist.*, 361 U. S., at 383. In determining whether this standard of justification has been met, it is inappropriate to rely solely on the mode of analysis developed in our equal protection cases. We have previously observed that "our decisions in [the equal protection] field are not necessarily controlling where problems of intergovernmental tax immunity are involved," because "the Government's interests must be weighed in the balance." *Id.*, at 385. Instead, the relevant inquiry is whether the inconsistent tax treatment is directly related to, and justified by, "significant differences between the two classes." *Id.*, at 383–385.

The State points to two allegedly significant differences between federal and state retirees. First, the State suggests that its interest in hiring and retaining qualified civil servants through the inducement of a tax exemption for retirement benefits is sufficient to justify the preferential treatment of its retired employees. This argument is wholly beside the point, however, for it does nothing to demonstrate that there are "significant differences between the two classes" themselves; rather, it merely demonstrates that the State has a rational reason for discriminating between two similar groups of retirees. The State's interest in adopting the discriminatory tax, no matter how substantial, is simply irrelevant to an inquiry into the nature of the two classes receiving inconsistent treatment. See *id.*, at 384.

Second, the State argues that its retirement benefits are significantly less munificent than those offered by the Federal Government, in terms of vesting requirements, rate of accrual, and computation of benefit amounts. The substantial differences in the value of the retirement benefits paid the two classes should, in the State's view, justify the inconsistent tax treatment.

Even assuming the State's estimate of the relative value of state and federal retirement benefits is generally correct, we do not believe this difference suffices to justify the type of blanket exemption at issue in this case. While the average retired federal civil servant receives a larger pension than his state counterpart, there are undoubtedly many individual instances in which the opposite holds true. A tax exemption truly intended to account for differences in retirement benefits would not discriminate on the basis of the source of those benefits, as Michigan's statute does; rather, it would discriminate on the basis of the amount of benefits received by individual retirees. Cf. *Phillips Chemical Co.*, *supra*, at 384–385 (rejecting proffered rationale for State's unfavorable tax treatment of lessees of federal property, because an evenhanded application of the rationale would have resulted in inclusion of some lessees of state property in the disfavored class as well).

## V

For these reasons, we conclude that the Michigan Income Tax Act violates principles of intergovernmental tax immunity by favoring retired state and local government employees over retired federal employees. The State having conceded that a refund is appropriate in these circumstances, see Brief for Appellee 63, to the extent appellant has paid taxes pursuant to this invalid tax scheme, he is entitled to a refund. See *Iowa-Des Moines National Bank* v. *Bennett*, 284 U. S. 239, 247 (1931).

Appellant also seeks prospective relief from discriminatory taxation. With respect to this claim, however, we are not in the best position to ascertain the appropriate remedy. While invalidation of Michigan's income tax law in its entirety obviously would eliminate the constitutional violation, the Constitution does not require such a drastic solution. We have recognized, in cases involving invalid classifications in the distribution of government benefits, that the appropriate remedy "is a *mandate* of equal treatment, a result that can be

accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler* v. *Mathews*, 465 U. S. 728, 740 (1984). See *Iowa-Des Moines National Bank, supra*, at 247; see also *Welsh* v. *United States*, 398 U. S. 333, 361 (1970) (Harlan, J., concurring in judgment).

In this case, appellant's claim could be resolved either by extending the tax exemption to retired federal employees (or to all retired employees), or by eliminating the exemption for retired state and local government employees. The latter approach, of course, could be construed as the direct imposition of a state tax, a remedy beyond the power of a federal court. See *Moses Lake Homes, Inc.* v. *Grant County*, 365 U. S., at 752 ("Federal courts may not assess or levy taxes"). The permissibility of either approach, moreover, depends in part on the severability of a portion of § 206.30(1)(f) from the remainder of the Michigan Income Tax Act, a question of state law within the special expertise of the Michigan courts. See *Louis K. Liggett Co.* v. *Lee*, 288 U. S. 517, 540–541 (1933). It follows that the Michigan courts are in the best position to determine how to comply with the mandate of equal treatment. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

The States can tax federal employees or private parties who do business with the United States so long as the tax does not discriminate against the United States. *South Carolina* v. *Baker*, 485 U. S. 505, 523 (1988); *United States* v. *County of Fresno*, 429 U. S. 452, 462 (1977). The Court today strikes down a state tax that applies equally to the vast majority of Michigan residents, including federal employees, because it treats retired state employees differently from retired federal employees. The Court's holding is not supported by the rationale for the intergovernmental immu-

nity doctrine and is not compelled by our previous decisions. I cannot join the unjustified, court-imposed restriction on a State's power to administer its own affairs.

The constitutional doctrine of intergovernmental immunity, Justice Frankfurter explained, "finds its explanation and justification . . . in avoiding the potentialities of friction and furthering the smooth operation of complicated governmental machinery." *City of Detroit* v. *Murray Corp.*, 355 U. S. 489, 504 (1958). To protect the smooth operation of dual governments in a federal system, it was at one time thought necessary to prohibit state taxation of the salaries of officers and employees of the United States, *Dobbins* v. *Commissioners of Erie County*, 16 Pet. 435 (1842), as well as federal taxation of the salaries of state officials. *Collector* v. *Day*, 11 Wall. 113 (1871). The Court has since forsworn such "wooden formalism." *Washington* v. *United States*, 460 U. S. 536, 544 (1983).

The nondiscrimination rule recognizes the fact that the Federal Government has no voice in the policy decisions made by the several States. The Federal Government's protection against state taxation that singles out federal agencies for special burdens is therefore provided by the Supremacy Clause of the Federal Constitution, the doctrine of intergovernmental tax immunity, and statutes such as 4 U. S. C. § 111.[1] When the tax burden is shared equally by federal agents and the vast majority of a State's citizens, however, the nondiscrimination principle is not applicable and constitutional protection is not necessary. As the Court explained in *United States* v. *County of Fresno:*

---

[1] The legislative history of 4 U. S. C. § 111 correctly describes the purpose of the nondiscrimination principle as "[t]o protect the Federal Government against the unlikely possibility of State and local taxation of compensation of Federal officers and employees which is aimed at, or threatens the efficient operation of, the Federal Government." H. R. Rep. No. 26, 76th Cong., 1st Sess., 5 (1939); S. Rep. No. 112, 76th Cong., 1st Sess., 12 (1939).

"The rule to be derived from the Court's more recent decisions, then, is that the economic burden on a federal function of a state tax imposed on those who deal with the Federal Government does not render the tax unconstitutional so long as the tax is imposed equally on the other similarly situated constituents of the State. This rule returns to the original intent of *M'Culloch* v. *Maryland.* The political check against abuse of the taxing power found lacking in *M'Culloch*, where the tax was imposed solely on the Bank of the United States, is present where the State imposes a nondiscriminatory tax only on its constituents or their artificially owned entities; and *M'Culloch* foresaw the unfairness in forcing a State to exempt private individuals with beneficial interests in federal property from taxes imposed on similar interests held by others in private property. Accordingly, *M'Culloch* expressly excluded from its rule a tax on 'the interest which the citizens of Maryland may hold [in a federal instrumentality] in common with other property of the same description throughout the State.' 4 Wheat., at 436." 429 U. S., at 462–464.[2]

---

[2] The quotation in the text omits one footnote, but this footnote is relevant:

" [11] A tax on the income of federal employees, or a tax on the possessory interest of federal employees in Government houses, if imposed only on them, could be escalated by a State so as to destroy the federal function performed by them either by making the Federal Government unable to hire anyone or by causing the Federal Government to pay prohibitively high salaries. This danger would never arise, however, if the tax is also imposed on the income and property interests of all other residents and voters of the State." 429 U. S., at 463.

The Court has repeatedly emphasized that the rationale of the nondiscrimination rule is met when there is a political check against excessive taxation. See *South Carolina* v. *Baker*, 485 U. S. 505, 526, n. 15 (1988) ("[T]he best safeguard against excessive taxation (and the most judicially manageable) is the requirement that the government tax in a nondiscriminatory fashion. For where a government imposes a nondiscriminatory tax, judges can term the tax 'excessive' only by second-guessing the extent to which the taxing

If Michigan were to tax the income of federal employees without imposing a like tax on others, the tax would be plainly unconstitutional. Cf. *McCulloch* v. *Maryland*, 4 Wheat. 316, 425–437 (1819). On the other hand, if the State taxes the income of all its residents equally, federal employees must pay the tax. *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466 (1939). See *United States* v. *County of Fresno*, 429 U. S., at 468 (STEVENS, J., dissenting). The Michigan tax here applies to approximately 4½ million individual taxpayers in the State, including the 24,000 retired federal employees. It exempts only the 130,000 retired state employees. Tr. of Oral Arg. 35–36. Once one understands the underlying reason for the *McCulloch* holding, it is plain that this tax does not unconstitutionally discriminate against federal employees.

The Court reaches the opposite result only by examining whether the tax treatment of federal employees is equal to that of one discrete group of Michigan residents—retired state employees. It states: "It is undisputed that Michigan's tax system discriminates in favor of retired state employees and against retired federal employees." *Ante*, at 814. But it does not necessarily follow that such a tax "discriminate[s] against the [federal] officer or employee because of the source of the pay or compensation." 4 U. S. C. § 111. The fact that a State may elect to grant a preference, or an exemption, to a small percentage of its residents does not make the tax discriminatory in any sense that is relevant to the doctrine of intergovernmental tax immunity. The obligation of a federal judge to pay the same tax that is imposed on the

government and its people have taxed themselves, and the threat of destroying another government can be realized only if the taxing government is willing to impose taxes that will also destroy itself or its constituents"); *Washington* v. *United States*, 460 U. S. 536, 545 (1983) ("A 'political check' is provided when a state tax falls on a significant group of state citizens who can be counted upon to use their votes to keep the State from raising the tax excessively, and thus placing an unfair burden on the Federal Government. It has been thought necessary because the United States does not have a direct voice in the state legislatures").

income of similarly situated citizens in the State should not be affected by the fact that the State might choose to grant an exemption to a few of its taxpayers—whether they be state judges, other state employees, or perhaps a select group of private citizens. Such an exemption might be granted "in spite of" and not necessarily "because of" its adverse effect on federal employees. Cf. *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S. 256, 279 (1979). Indeed, at least 14 other States grant special tax exemptions for retirement income to state and local government employees that they do not grant to federal employees.[3] As long as a state

---

[3] See Ariz. Rev. Stat. Ann. §§ 43–1022(3) and (4) (Supp. 1988) (benefits, annuities, and pensions received from the state retirement system, the state retirement plan, the judges' retirement fund, the public safety personnel retirement system, or a county or city retirement plan exempt in their entirety; income received from the United States civil service retirement system exempt only up to $2500); Colo. Rev. Stat. §§ 39–22–104(4)(f) and (g) (Supp. 1988) (amounts received as pensions or annuities from any source exempt up to $20,000, but amounts received from Federal Government as retirement pay by retired member of Armed Forces less than 55 years of age exempt only up to $2000); Ga. Code Ann. § 48–7–27(a)(4)(A) (Supp. 1988) (income from employees' retirement system exempt); La. Rev. Stat. Ann. §§ 42:545, 47:44.1 (West Supp. 1989) (annuities, retirement allowances and benefits paid under the state employee retirement system exempt from state or municipal taxation in their entirety, but other annuities exempt only up to $6000); Md. Tax-Gen. Code Ann. § 10–207(o) (1988) (fire, rescue, or ambulance personnel length of service award funded by any county or municipal corporation of State exempt); Mo. Rev. Stat. § 169.587 (Supp. 1989) (retirement allowance, benefit, funds, property, or rights under public school retirement system exempt); Mont. Code Ann. §§ 15–30–111(2)(c)–(f) (1987) (benefits under teachers retirement law, public employees retirement system, and highway patrol law exempt in their entirety; benefits under Federal Employees Retirement Act exempt only up to $3600); N. Y. Tax Law § 612(c)(3) (McKinney 1987) (pensions to officers and employees of State, its subdivisions and agencies exempt); N. C. Gen. Stat. §§ 105–141(b)(13) and (14) (Supp. 1988) (amounts received from retirement and pension funds established for firemen and law enforcement officers exempt in their entirety, but amounts received from federal-employee-retirement program exempt only up to $4000); Ore. Rev. Stat. §§ 316.680(1)(c) and (d) (1987) (payments from Public Employes Retire-

income tax draws no distinction between the federal employees or retirees and the vast majority of voters in the State, I see no reason for concern about the kind of "discrimination" that these provisions make. The intergovernmental immunity doctrine simply does not constitute a most favored nation provision requiring the States to accord federal employees and federal contractors the greatest tax benefits that they give any other group subject to their jurisdiction.

To be sure, there is discrimination against federal employees—and all other Michigan taxpayers—if a small group of residents is granted an exemption. If the size of the exempt group remains the same—say, no more than 10% of the populace—the burden on federal interests also remains the same, regardless of how the exempt class is defined. Whether it includes schoolteachers, church employees, state judges, or perhaps handicapped persons, is a matter of indifference to the Federal Government as long as it can fairly be said that

———————

ment Fund exempt in their entirety, but payments under public retirement system established by United States exempt only up to $5000); S. C. Code §§ 12–7–435(a), (d), (e) (Supp. 1988) (amounts received from state retirement systems and retirement pay received by police officers and firemen from municipal or county retirement plans exempt in their entirety; federal civil service retirement annuity exempt only up to $3000); Va. Code § 58.1–322(C)(3) (Supp. 1988) (pensions or retirement income to officers or employees of Commonwealth, its subdivisions and agencies, or surviving spouses of such officers or employees paid by the Commonwealth or an agency or subdivision thereof exempt); W. Va. Code §§ 11–21–12(c)(5) and (6) (Supp. 1988) (annuities, retirement allowances, returns of contributions or any other benefit received under the public employees retirement system, the department of public safety death, disability, and retirement fund, the state teachers' retirement system, pensions and annuities under any police or firemen's retirement system exempt); Wis. Stat. § 71.05(1)(a) (Supp. 1988–1989) (payments received from the employees' retirement system of city of Milwaukee, Milwaukee city employees' retirement system, sheriff's retirement and benefit fund of Milwaukee, firefighters' annuity and benefit fund of Milwaukee, the public employee trust fund, and the state teachers' retirement system exempt).

federal employees are treated like other ordinary residents of the State.

Even if it were appropriate to determine the discriminatory nature of a tax system by comparing the treatment of federal employees with the treatment of another discrete group of persons, it is peculiarly inappropriate to focus solely on the treatment of state governmental employees. The State may always compensate in pay or salary for what it assesses in taxes. Thus a special tax imposed only on federal and state employees nonetheless may reflect the type of disparate treatment that the intergovernmental tax immunity forbids because of the ability of the State to adjust the compensation of its employees to avoid any special tax burden on them. *United States* v. *County of Fresno*, 429 U. S., at 468–469 (STEVENS, J., dissenting). It trivializes the Supremacy Clause to interpret it as prohibiting the States from providing through this limited tax exemption what the State has an unquestionable right to provide through increased retirement benefits.[4]

Arguably, the Court's holding today is merely a logical extension of our decisions in *Phillips Chemical Co.* v. *Dumas Independent School Dist.*, 361 U. S. 376 (1960), and *Memphis Bank & Trust Co.* v. *Garner*, 459 U. S. 392 (1983). Even if it were, I would disagree with it. Those cases are, however, significantly different.

---

[4] The Court also suggests that compensating state employees through tax exemptions rather than through increased pension benefits discriminates against federal taxpayers by reducing the pension income subject to federal taxation. See *ante*, at 815, n. 4. But retired state employees are not alone in receiving a subsidy through a tax exemption. Michigan, like most States, provides tax exemptions to select industries and groups. See, *e. g.*, Mich. Comp. Laws Ann. § 205.54a(g) (West 1986 and Supp. 1988) (industrial processing), and § 205.54a(p) (1986) (pollution control). That the State chooses to proceed by indirect subsidy rather than direct subsidy, however, should not render the tax invalid under the Supremacy Clause.

*Phillips* involved a tax that applied only to lessees of federal property. Article 5248 of the Texas Code imposed a tax on lessees of federal lands measured by the value of the fee held by the United States. Article 7173 of the Code, the only other provision that authorized a tax on lessees, either granted an exemption to lessees of other public lands or taxed them at a lower rate. Lessees of privately owned property paid no tax at all.[5] The company argued that "because Article 5248 applies only to private users of federal property, it is invalid for that reason, without more." 361 U. S., at 382. The Court rejected that argument, reasoning that it was "necessary to determine how other taxpayers similarly situated are treated." *Id.*, at 383. It then defined the relevant classes of "similarly situated" taxpayers as the federal lessees who were taxed under Article 5248 and the lessees of other public property taxed under Article 7173. Within that narrow focus, the Court rejected the school district's argument that the discrimination between the two classes could be justified. Because the Court confined its analysis to the two state taxes that applied to lessees of public property, its reasoning would be controlling in the case before us today if Michigan's income tax applied only to public employees; on that hypothesis, if state employees were exempted, the tax would obviously discriminate against federal employees.

The troublesome aspect of the Court's opinion in *Phillips* is its failure to attach any significance to the fact that the tax on private landlords presumably imposed an indirect burden on

[5] "Although Article 7173 is, in terms, applicable to all lessees who hold tax-exempt property under a lease for a term of three years or more, it appears that only lessees of *public* property fall within this class in Texas. Tax exemptions for real property owned by private organizations—charities, churches, and similar entities—do not survive a lease to a business lessee. The full value of the leased property becomes taxable to the owner, and the lessee's indirect burden consequently is as heavy as the burden imposed directly on federal lessees by Article 5248." 361 U. S., at 380–381 (emphasis in original; footnote omitted).

their lessees that was as heavy as the direct burden on federal lessees imposed by Article 5248. The Court did note that "[u]nder these circumstances, there appears to be no discrimination between the Government's lessees and lessees of private property." *Id.*, at 381. But—possibly because of the school district's rather unwise reliance on an equal protection analysis of the case[6]—the Court never even considered the question whether the political check provided by private property owners was sufficient to save that tax from the claim that it singled out federal lessees for an unconstitutional tax burden.[7]

In *Memphis Bank & Trust Co.*, the question presented was the lawfulness of a Tennessee tax on the net earnings of

---

[6] "The School District addresses this problem, essentially, as one of equal protection, and argues that we must uphold the classification, though apparently discriminatory, 'if any state of facts reasonably can be conceived that would sustain it.' *Allied Stores* v. *Bowers*, 358 U. S. 522, 528." *Id.*, at 383.

[7] An interesting feature of the *Phillips* opinion is its reference to the fact that the tax upheld in *United States* v. *City of Detroit*, 355 U. S. 466 (1958), had actually included an exemption for school-owned property—and therefore discriminated "against" federal property in the same way the tax involved in this case discriminates "against" federal employees.

"This argument misconceives the scope of the Michigan decisions. In those cases we did not decide—in fact, we were not asked to decide—whether the exemption of school-owned property rendered the statute discriminatory. Neither the Government nor its lessees, to whom the statute was applicable, claimed discrimination of this character." *Phillips Chemical Co.* v. *Dumas Independent School Dist.*, 361 U. S., at 386.

The Court's description of the relevant class of property subject to tax in the *Detroit* case obviously would have provided the same political check against discrimination regardless of how the school property might have been classified. In *Detroit*, Justice Black described that class as follows:

"But here the tax applies to every private party who uses exempt property in Michigan in connection with a business conducted for private gain. Under Michigan law this means persons who use property owned by the Federal Government, the State, its political subdivisions, churches, charitable organizations and a great host of other entities. The class defined is not an arbitrary or invidiously discriminatory one." 355 U. S., at 473.

banks doing business in the State that defined net earnings to "include interest received by the bank on the obligations of the United States and its instrumentalities, as well as interest on bonds and other obligations of States other than Tennessee, but [to] exclude interest on obligations of Tennessee and its political subdivisions." 459 U. S., at 394. Although the federal obligations were part of a large class and the tax therefore did not discriminate only against the income derived from a federal source, all other members of the disfavored class were also unrepresented in the Tennessee Legislature. There was, therefore, no political check to protect the out-of-state issuers, including the federal instrumentalities, from precisely the same kind of discrimination involved in *McCulloch* v. *Maryland.* Indeed, in the *McCulloch* case itself, the taxing statute did not, in terms, single out the National Bank for disfavored treatment; the tax was imposed on "all Banks, or branches thereof, in the State of Maryland, *not chartered by the legislature.*" 4 Wheat., at 317–318. A tax that discriminates against a class of nonresidents, including federal instrumentalities, clearly is not protected by the political check that saved the state taxes in cases like *United States* v. *County of Fresno,* 429 U. S. 452 (1977), and *City of Detroit* v. *Murray Corp.,* 355 U. S. 489 (1958).

When the Court rejected the claim that a federal employee's income is immune from state taxation in *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466 (1939), Justice Frankfurter wrote separately to explain how a "seductive cliché" had infected the doctrine of intergovernmental immunity, which had been "moving in the realm of what Lincoln called 'pernicious abstractions.'" He correctly noted that only a "web of unreality" could explain how the "[f]ailure to exempt public functionaries from the universal duties of citizenship to pay for the costs of government was hypothetically transmuted into hostile action of one government against the other." *Id.,* at 489–490.

Today, it is not the great Chief Justice's dictum about how the power to tax includes the power to destroy that obscures the issue in a web of unreality; it is the virtually automatic rejection of anything that can be labeled "discriminatory." The question in this case deserves more careful consideration than is provided by the mere use of that label. It should be answered by considering whether the *ratio decidendi* of our holding in *McCulloch* v. *Maryland* is applicable to this quite different case. It is not. I, therefore, respectfully dissent.